# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,    )
                  )
        Plaintiff,    )
                  )
        v.           )    Criminal No. 2018-31
                  )
EZEQUIEL RIVERA GOMEZ aka  )
FRANCISCO MEJIA,       )
                  )
        Defendant.   )
                  )
UNITED STATES OF AMERICA,    )
                  )
        Plaintiff,    )
                  )
        v.           )    Criminal No. 2018-32
                  )
LUIS MIGUEL RECIO-FERNANDEZ,  )
                  )
        Defendant.   )
                  )

ATTORNEYS:

**Gretchen Shappert, United States Attorney**
**Everard E. Potter, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
    *For the United States of America,*

**Omodare Jupiter, FPD**
**Gabriel J. Villegas, AFPD**
Office of the Federal Public Defender
St. Thomas, U.S.V.I.
    *For Ezequiel Rivera Gomez and Luis Miguel Recio-Fernandez.*

## ORDER

**GÓMEZ, J.**

    Before the Court are the motions of Ezequiel Rivera Gomez and Luis Miguel Recio-Fernandez to suppress oral statements and physical evidence obtained following an alleged illegal seizure.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 2

## I.    FACTUAL AND PROCEDURAL HISTORY

The relevant facts in this case that pertain to the motions before the Court were adduced during the course of an October 29, 2018, omnibus hearing in this matter. The Court heard testimony from several witnesses, beginning with Customs and Border Protection ("CBP") Officer Bryan McCoy ("McCoy").

McCoy testified that CBP had received general intelligence that vessels had been coming from the direction of the British Virgin Islands and dropping off individuals on the beaches of St. John. Marine interdiction units reported a steady increase of such drops and had contact with several vessels. Additionally, marine interdiction units had reported chasing vessels to St. John beaches where individuals disembarked the vessels and evaded officers. CBP also received various calls from persons generally described by McCoy as local St. Johnians. The local St. Johnians reported that individuals, who the local St. Johnians claimed were illegal immigrants, were being dropped off on the east end of St. John and traveling toward Cruz Bay to board the ferry to St. Thomas. The local St. Johnians reported that the purported illegal immigrants were using the last two scheduled ferry departures from St. John in the evenings.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 3

McCoy testified that CBP undertook no efforts to verify or corroborate the tips from the local St. Johnians that the last two ferries were being used by illegal immigrants to travel from St. John to St. Thomas:

> THE COURT: And I may have asked you this before, what, if anything, did your agency undertake to verify, to corroborate that in fact there are illegals on the ferry, as opposed to some generalized view that there are people who look different on the ferry?
>
> THE WITNESS: The only thing that we did was the "Operation Get a Grip" to verify that.
>
> THE COURT: Okay. So before you undertook the operation you did nothing. Is that correct?
>
> THE WITNESS: We did nothing to verify that, yes, sir. Because I don't see any other way to verify that, as opposed to doing these stops for identification and citizenship.

Tr. of Omnibus Hr'g 62:3-15, October 29, 2018. Additionally, the United States presented no evidence that the individuals dropped on St. John beaches who then evaded law enforcement were violating immigration laws as opposed to customs or other laws.[1]

---

[1] For example, U.S. citizens coming to St. John from the British Virgin Islands could be returning home. Alternatively, U.S. citizens could be smuggling drugs or cash. It is reasonable to infer that the latter group of such individuals would attempt to evade law enforcement. While such citizens would be in violation of the law, *see e.g.* 21 U.S.C. § 952, 31 U.S.C. § 5332, they would not be within the United States illegally. Officer McCoy agreed that CBP would not have the authority to exclude such individuals from the United States:

> THE COURT: Officer McCoy, is it the case that a person who is legally in the United States has to clear Customs if they come from the British Virgin Islands?

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 4

As a result of the intelligence, the CBP management team designed an operation that would be launched at the Red Hook ferry terminal in St. Thomas. The operation, which bore the name "Operation Get A Grip," would stop and question all individuals traveling on the regularly scheduled ferry service that left from Cruz Bay, St. John, to the Red Hook ferry terminal in St. Thomas. On August 27, 2018, the operation commenced-- specifically targeting the last two ferries of the night.

McCoy testified that there was no specific information about particular individuals on the ferry that night.

> Q: And you didn't have any specific information that either one of my clients that are sitting here today were going to be on that ferry on August 27. Is that right?

> A: No one in particular. No, sir.

Tr. of Omnibus Hr'g 27:2-6, October 29, 2018.

---

THE WITNESS: That they have to clear customs?
THE COURT: Yes. If they come from a foreign origination?
THE WITNESS: Correct.
THE COURT: Okay. And if they, and if they don't, that is, a legal U.S. Citizen or someone legally in the United States comes from the British Virgin Islands and enters St. John or at St. John and they don't clear, they would be in violation of the law that says you have to clear. Would that be correct?
THE WITNESS: Yes, sir.
THE COURT: But they would otherwise be legally in the country but not necessarily within the compliance of the law that requires that you clear before you come into the country. Is that correct?
THE WITNESS: Correct. Because we will never tell a United States citizen that they cannot be in the United States.
Tr. of Omnibus Hr'g 20:25-21:21, October 29, 2018.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 5

On August 27, 2018, at approximately 9:15 p.m., Ezequiel Rivera Gomez ("Rivera Gomez") and Luis Miguel Recio-Fernandez ("Recio-Fernandez") were each traveling on a regularly scheduled commercial ferry from the island of St. John in the United States Virgin Islands to the sister island of St. Thomas in the United States Virgin Islands.[2]

Once the first ferry docked in St. Thomas at the Red Hook terminal, a CBP supervisor made a general announcement that passengers should have their identification ready to present to officers as the passengers disembarked. Five to seven officers stood on each side of the gangway, forming columns of officers through which the passengers disembarked. Each officer was armed. No officer brandished a firearm. As each passenger disembarked, one of the ten to fourteen officers summoned the passenger. The passenger stood directly in front of the officer and presented identification. In a normal tone of voice, officers asked each passenger to provide details pertaining to citizenship such as country of birth, citizenship, or current residence. Each passenger was questioned for 10-15 seconds. The CBP officers questioned a total of 30-40 passengers who

---

[2] It is unclear whether Rivera Gomez and Recio-Fernandez were traveling separately or together.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 6

disembarked the ferry. In total, the questioning lasted 20-30 minutes.

McCoy testified that if a passenger could not present any identification or satisfy the questioning of the CBP officers, then the individual would be detained while system checks were performed. McCoy explicitly stated that if an individual did not provide the information sought by CBP officers, then that individual was not free to go:

> THE COURT: Now as I understood your testimony earlier, you had testified that if you could not present any identification or sufficient information with respect to the questioning, with respect to citizenship, then you were temporarily detained, set off to the side for further questioning. Is that the case?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Okay. So was it your position then that in order to be free to go you had to provide certain information to you. Is that correct?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Okay. And was anyone told that they could refuse to answer your questions or refuse to go through the inquiry?
>
> THE WITNESS: They were not told at the time. No, sir.
>
> THE COURT: Okay. And the people who were disembarking, were they required to be, or was it your requirement

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 7

that they had to answer your questions failing which
they would be set aside for further questioning?

THE WITNESS: Yes, sir.

Tr. of Omnibus Hr'g 62:16-63:12, October 29, 2018. A total of

four to five individuals were detained for further questioning.

McCoy testified that both Rivera Gomez and Recio-Fernandez

were each questioned by CBP Officer Gamaliel Flores ("Flores")

as each man disembarked the ferry. Rivera Gomez and Recio-

Fernandez were each questioned about their immigration status.

They were each asked to produce documentation. After further

system checks and fingerprinting, CBP determined that Rivera

Gomez and Recio-Fernandez were not in the United States legally.

Rivera Gomez and Recio-Fernandez were subsequently taken into

custody by Immigration and Customs Enforcement ("ICE") agents.

McCoy testified that CBP possessed no particularized

information regarding the presence of illegal immigrant

passengers on the specific ferry that was targeted on August 27,

2018. Rather, CBP was acting on generalized information

regarding use of the ferries by suspected illegal immigrants.

The ferry from which Rivera Gomez and Recio-Fernandez

disembarked was the first and only ferry that was targeted by

CBP officers.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 8

On September 13, 2018, a federal grand jury returned an Indictment charging Rivera Gomez with illegally entering the United States after having been removed in violation of 8 U.S.C. § 1326(a)(2) and (b)(2). On the same date, the grand jury also returned a separate Indictment charging Recio-Fernandez with the same violation.

On October 26, 2018, Rivera Gomez and Recio-Fernandez each moved to suppress statements and physical evidence. Rivera Gomez and Recio-Fernandez each argue that their arrests were illegal.

## II.  DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 9

Generally, warrantless searches and seizures are *per se*

unreasonable under the Fourth Amendment. *United States v.*

*Williams*, 413 F.3d 347, 351 (3d Cir. 2005). However, there are

several exceptions to this rule. "[A]n officer may, consistent

with the Fourth Amendment, conduct a brief, investigatory stop

when the officer has a reasonable, articulable suspicion that

criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119,

123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

"[R]easonable suspicion unequivocally demands that the detaining

officers must have a particularized and objective basis for

suspecting the particular person stopped for criminal activity."

*United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018). To

establish reasonable suspicion, "[an] officer must be able to

articulate more than an 'inchoate and unparticularized suspicion

or "hunch"' of criminal activity." *Wardlow*, 528 U.S. at 123-24

(quoting *Terry*, 392 U.S. at 27). As the Third Circuit has

explained

> [t]he Supreme Court has repeatedly recognized that a
> reasonable suspicion may be the result of any
> combination of one or several factors: specialized
> knowledge and investigative inferences (*United States v.*
> *Cortez*), personal observation of suspicious behavior
> (*Terry v. Ohio*), information from sources that have
> proven to be reliable, and information from sources that
> -- while unknown to the police -- prove by the accuracy
> and intimacy of the information provided to be reliable

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 10

> at least as to the details contained within that tip
> (*Alabama v. White*).

*United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002). "The ultimate question is whether the record is sufficient to establish that police had a reasonable suspicion based on articulated facts that would justify the search or seizure of the individual in question." *Bey*, 911 F.3d at 145.

Generally, evidence obtained following a violation of a defendant's constitutional rights will be suppressed as "fruit of the poisonous tree." *United States v. Mosley*, 454 F.3d 249, 269 (3d Cir. 2006) (applying exclusionary rule based on illegal seizure in violation of the Fourth Amendment). Such "fruits" include both statements made in the wake of an unconstitutional arrest, *Brown v. Illinois*, 422 U.S. 590, 605 (1975) (suppressing two voluntary statements as fruits of an illegal arrest), as well as physical evidence, *Mosley*, 454 F.3d at 269 (suppressing guns discovered pursuant to an illegal traffic stop).

## III. ANALYSIS

Rivera Gomez and Recio-Fernandez argue that the Government seized them in violation of the Fourth Amendment when CBP officers questioned them without any individualized suspicion as they disembarked the ferry. Rivera Gomez and Recio-Fernandez argue that any evidence subsequently obtained as the result of

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 11

the unconstitutional seizure must be excluded as fruit of the poisonous tree. The Court will first assess whether Rivera Gomez and Recio-Fernandez were seized.

In *United States v. Silveus*, 542 F.3d 993 (3d Cir. 2008), this Court had occasion to address the seizure of passengers disembarking the ferry at the Red Hook terminal. In that case, Dorsainvil Jean ("Jean") was required to self-report to government officials for deportation. Jean failed to report as required. *Id.* at 997. Immigration officials went to Jean's residence. *Id.* Jean was not found there. *Id.*

Thereafter, Immigration and Customs Enforcement ("ICE") Agent Michael Harrison ("Harrison") reported that he received a tip from an anonymous informant. *Id.* The informant stated that Jean and Rozaline Silveus ("Silveus") were in St. John to pick up illegal aliens and transport them in Silveus's SUV to St. Thomas via car ferry. *Id.* Additionally, the informant identified both Jean and Silveus by name and identified the license plate number and color of Silveus's SUV. *Id.* At a suppression hearing, Agent Harrison testified that he had received a similar tip from a person with an identical voice two weeks earlier, leading him to believe that the informant was the same person. *Id.*

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 12

As a result of that tip, two agents were dispatched to the Red Hook ferry terminal to intercept the ferry from St. John. *Id.* When the ferry arrived, the agents prevented all passengers from disembarking, then boarded the boat and located the SUV that had been identified by the informant. *Id.* Silveus was subsequently arrested, charged, and tried for aiding and abetting the transportation of illegal aliens. Silveus moved to suppress evidence seized from her car arguing that the initial seizure of the ferry violated the Fourth Amendment. *Id.* at 998. This Court denied the motion to suppress.

On appeal, the Third Circuit affirmed. First, the Third Circuit found that Silveus was seized when "agents, through a show of authority, prevented Silveus from disembarking the ferry." *Silveus*, 542 F.3d at 999 (citing *Mosley*, 454 F.3d at 253 ('[I]t is settled law that a traffic stop is a seizure of everyone in the stopped vehicle.')). Nonetheless, the Third Circuit held the seizure to be constitutional because it was based on reasonable suspicion.

Here, passengers were required to present identification and answer CBP officers' questions as the passengers disembarked the ferry. The United States contends that the passengers were free to disregard the CBP officers' questions and walk away.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 13

However, the testimony elicited at the October 29, 2018, omnibus

hearing flatly contradicts such a position. Indeed, McCoy

testified that disembarking passengers were not free to go until

they had satisfied the inquiries of the CBP officers:

> Q: But in the operation were any passengers encountered who
> did not have forms of United States identification?
>
> A: Yes, sir.
>
> Q: And tell us what was done with these individuals?
>
> A: If you could not present any identification or suffice
> the questioning of the officer in regards to citizenship,
> then you were placed, you were temporarily detained and sat
> off to the side for further questioning and system checks.

Tr. of Omnibus Hr'g 11:24-12:8, October 29, 2018. To the extent

there was any doubt as to whether the passengers were free to

refuse to answer questions and walk away, McCoy clarified that

they were not.

> THE COURT: Okay. And was anyone told that they could
> refuse to answer your questions or refuse to go
> through the inquiry?
>
> THE WITNESS: They were not told at the time. No sir.
>
> THE COURT: Okay. And the people who were disembarking,
> were they required to be, or was it your requirement
> that they had to answer your questions failing which
> they would be set aside for further questioning?
>
> THE WITNESS: Yes, sir.

Tr. of Omnibus Hr'g 63:2-12, October 29, 2018. Those

circumstances fall squarely within the contours of a Fourth

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 14

Amendment seizure. *Compare Terry*, 392 U.S. at 16 (stating that

"[i]t must be recognized that whenever a police officer accosts

an individual and restrains his freedom to walk away, he has

'seized' that person"); *with Mendenhall*, 446 U.S. at 554 (noting

that "as long as the person to whom questions are put remains

free to disregard the questions and walk away" there has been no

Fourth Amendment seizure). Indeed, in view of all the attendant

circumstances, including the CBP show of authority coupled with

the requirement of a satisfactory answer as a prerequisite to

freedom, Rivera Gomez and Recio-Fernandez were seized just as

Rozaline Silveus was in *United States v. Silveus*.

Having determined that Rivera Gomez and Recio-Fernandez

were seized, the Court will address whether that seizure was

constitutionally permissible.

In *Terry v. Ohio*, 392 U.S. 1 (1968), a patrolling law

enforcement officer in downtown Cleveland observed John Terry

("Terry") and Richard Chilton ("Chilton") walk past a store

window, peer into the window, and return to the same street

corner about twelve times. *Terry*, 392 U.S. at 6. After following

Terry and Chilton down another street, where they met another

man, the officer approached the three men to investigate. *Id.*

The officer identified himself as a police officer and asked for

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 15

the mens' names. *Id.* at 6-7. When the men mumbled a response, the officer grabbed Terry and patted down the outside of his clothing. *Id.* at 7. The officer felt a pistol in Terry's pocket. *Id.* Thereafter, the officer seized the gun and arrested Terry. *Id.* Subsequently, Terry was charged with carrying a concealed weapon. *Id.*

Terry moved to suppress the gun. Terry asserted that he was subject to an unconstitutional search and seizure lacking probable cause. The United States Supreme Court found that the stop and frisk of Terry was constitutionally permissible, holding that where an officer has a reasonable, articulable suspicion that "criminal activity may be afoot," the officer may conduct a brief investigatory stop and limited search for weapons. *Id.* at 30.

Such reasonable suspicion may be developed through anonymous tips from informants. *Adams v. Williams*, 407 U.S. 143, 147 (1972). In the context of anonymous tips, the Supreme Court has made clear that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' . . . [are] 'highly relevant in determining the value of his report.'" *Alabama v. White*, 496 U.S. 325, 328 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). Of course, "an anonymous tip alone seldom

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 16

demonstrates the informant's basis of knowledge or veracity."
*White*, 496 U.S. at 329. That is because "ordinary citizens
generally do not provide extensive recitations of the basis of
their everyday observations," and an anonymous tipster's
veracity is "'by hypothesis largely unknown, and unknowable.'"
*Id.* Nevertheless, there are situations in which an anonymous
tip, suitably corroborated, can demonstrate "sufficient indicia
of reliability to provide reasonable suspicion to make [an]
investigatory stop." *Id.* at 327.

In *Alabama v. White*, 496 U.S. 325 (1990), an anonymous
tipster told the police that, at a particular time, Vanessa
White ("White") would be driving from 235-C Lynwood Terrace
Apartments (the "apartment building") to Dobey's Motel (the
"motel") in a brown Plymouth station wagon with a broken right
tail light. *Id.* at 327. The tipster further asserted that the
woman would be transporting cocaine. *Id.* After receiving the
tip, officers immediately proceeded to the apartment building.
*Id.* at 331. The officers observed a brown Plymouth station wagon
with a broken right tail light in the parking lot in front of
the apartment building. *Id.* at 327. Not long after arriving, the
officers observed a woman leave the apartment building and drive
away in the station wagon. *Id.* The officers stopped the station

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 17

wagon as it neared the motel. *Id.* After receiving consent to
search the car for cocaine, the officers found marijuana in the
car. *Id.* The officers arrested White. *Id.* During processing at
the station, the officers also found three milligrams of cocaine
in White's purse. *Id.*

White moved to suppress the drugs. White asserted that she
was subject to an unconstitutional stop under the standard
articulated in *Terry*. The Supreme Court held that the officers'
corroboration of the car description, departure time, departure
location, and destination made the anonymous tip sufficiently
reliable to create reasonable suspicion of criminal activity.
Although it was a "close case," *id.* at 332, by accurately
predicting future behavior, the tipster demonstrated "a special
familiarity with respondent's affairs," *id.*, which in turn
implied that the tipster had "access to reliable information
about that individual's illegal activities." *Id.* The Supreme
Court also recognized that an informant who is proved to tell
the truth about some things is more likely to tell the truth
about other things, "including the claim that the object of the
tip is engaged in criminal activity." *Id.* at 331 (citing
*Illinois v. Gates*, 462 U.S. 213, 244 (1983)).

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 18

By contrast, in *Florida v. J. L.*, 529 U.S. 266 (2000), the Supreme Court determined that no reasonable suspicion arose from a bare bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun. *Id.* at 268. The tipster did not explain how he knew about the gun. *Id.* at 271. The tipster also did not suggest that he had any special familiarity with the young man's affairs. *Id.* Additionally, the tipster was unknown and thus unaccountable if his allegations turned out to be fabricated. *Id.* As a result, police had no basis for believing "that the tipster ha[d] knowledge of concealed criminal activity." *Id.* at 272. Furthermore, the tip included no predictions of future behavior that could be corroborated to assess the tipster's credibility. *Id.* at 271. Accordingly, the Supreme Court concluded that the tip was insufficiently reliable to justify a stop and frisk.

The Third Circuit has summarized which specific features of tips indicate reliability. When assessing a tip for sufficient indicia of reliability, the trial court should consider whether:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 19

the officer had an opportunity to appraise the witness's credibility through observation.

(2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.

(3) The content of the tip is not information that would be available to any observer. A not truly anonymous tip is accorded greater weight when the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not to the general public, and the tip could not have been generated by the general public, nor based solely on observation.

(4) The person providing the information has recently witnessed the alleged criminal activity.

(5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility. Predictive information is also useful in that it can reflect particularized knowledge.

*United States v. Brown*, 448 F.3d 239, 249-50 (3d Cir. 2006) (internal quotation marks and citations omitted).

The Third Circuit has cautioned that "[r]easonable suspicion, . . . requires that there must be some reason to believe not only that the caller was honest but also that he was well informed." *Brown*, 448 F.3d at 250 (internal quotation marks and citations omitted). "[O]ne citizen's subjective feelings are not enough to justify the seizure of another where the objective facts do not point to any articulable basis for suspicion." *Johnson v. Campbell*, 332 F.3d 199, 210 (3d Cir. 2003). Additionally, the Third Circuit has explained that, when

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 20

evaluating the reliability of tips from a known source, the

underlying principles from the anonymous tip context may also be

used. *Brown*, 448 F.3d at 249.

*Silveus* is again informative on the question of whether the

officers had reasonable suspicion based on the tips received.

There, the Third Circuit found that the *Terry* stop was

constitutionally permissible based on the reliability of the

tip, explaining that

> [t]he anonymous informant identified Jean and Silveus by
> name, placed them together, and identified Silveus's car
> by color and license plate number. The tip appeared to
> be reliable, given that it was corroborated by the
> agents' prior knowledge.
>
> . . .
>
> Unlike the tip in *J.L.*, the anonymous tipster in the
> present case provided information already known to the
> agents about ongoing criminal activity: Jean's continued
> failure to report for deportation. The informant also
> stated that Jean and Silveus were together in Silveus's
> vehicle. Given the agents' prior knowledge of the close
> relationship between Silveus and Jean, these details
> permitted a reasonable belief that the tip was in fact
> accurate. In short, when the tipster identified Jean,
> Silveus, and Silveus's vehicle, given the agents' prior
> knowledge, we believe they had a reasonable, articulable
> suspicion that criminal activity [was] afoot and they
> were justified in stopping Silveus from disembarking the
> ferry so that they could investigate further.

*Id.* at 1000-01 (internal quotation marks and citations omitted).

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 21

Here, CBP had information that individuals were coming from

the direction of the British Virgin Islands and being dropped

off on the beaches of St. John.

> THE COURT: What is the intelligence from Marine
> Interdiction? What is it based on?

> THE WITNESS: That Go-Fast boats were coming from foreign,
> the British Virgin Islands, and landing in St. John and
> passengers or people disembarking or jumping off the boat
> and fleeing into the bushes or walking along the roads
> towards the Cruz Bay area.

Tr. of Omnibus Hr'g 61:6-12, October 29, 2018. McCoy testified

that CBP targeted the last two ferries to depart St. John based

on the tips from local St. Johnians:

> THE COURT: And what intelligence is there about the last
> two ferries? Where is that from, and what is it?

> THE WITNESS: That intelligence was from the locals stating
> that these illegals were boarding the last two ferries and
> coming down, as opposed to the normal residents that the
> St. Johnians have seen. I'm assuming this is what it was.

> THE COURT: You said you're assuming.

> THE WITNESS: Yes, sir.

> THE COURT: I don't want you to assume. I need to know what
> you know. You understand?

> THE WITNESS: Okay. That the residents were stating that the
> last two ferries were being used by illegals to come down
> to St. Thomas from St. John.

Tr. of Omnibus Hr'g 61:13-62:2, October 29, 2018.

Significantly, the government failed to present any

evidence that CBP on its own, or in conjunction with the tips

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 22

from local St. Johnians, had generated evidence that any person

on the targeted ferry had: (1) been identified specifically as

an illegal immigrant; (2) been identified by a particular

physical description as being involved in criminal activity; or

(3) been placed in a chain of circumstances from which one could

conclude that such a specific person was involved in criminal

activity.

> THE COURT: What, if anything, did your agency undertake to establish whether or not the people getting off of the boats were legally in the United States or illegal migrants?
>
> THE WITNESS: Just what we were doing that evening.
>
> THE COURT: No. My question is a little more precise than that. As I understand it, what you said is that your agency received calls from locals. I presume that means St. Johnians, correct?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Okay. That there were migrants. I presume that means illegal migrants, correct?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Okay. How is it that your agency understood or believed that the people, that the local St. Johnians saw getting off of the boat were illegal migrants?
>
> THE WITNESS: By looking at an individual you cannot tell.[3] So with what you're asking, how do the St. Johnians know if they are legal or not, correct?

---

[3] As seemingly recognized by McCoy as an inherent problem with the tips from the local St. Johnians, racial or ethnic appearance alone is not grounds for

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 23

> THE COURT: My question is, what did your agency do to establish that?
>
> THE WITNESS: Oh, we heightened our enforcement on the water.
>
> THE COURT: But my question is, what did you do to verify, corroborate, or have anything that would raise the level of the suspicion of the local St. Johnians; what, if anything, did your agency do?
>
> THE WITNESS: With that question, I'm not really sure what the agency did.

Tr. of Omnibus Hr'g 18:24-20:4, October 29, 2018.

CBP relied on these tips from local St. Johnians to target the ferry terminals for immigration enforcement. Accordingly, the Court will assess the reliability of those tips under the framework outlined by the Third Circuit in *Brown*.

First, there is no record evidence that any St. Johnians provided any information to CBP through a face-to-face interaction. Thus, CBP did not have an opportunity to appraise the credibility of the local St. Johnians through observation.

---

reasonable suspicion that an individual is an illegal alien. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975) ("We cannot conclude that [the apparent Mexican ancestry of the occupants in a car] furnished reasonable grounds to believe that the three occupants were aliens."). Additionally, in the civil removal context, the Third Circuit has cited the Second Circuit with approval, noting that "even where the seizure is not especially severe, it may nevertheless qualify as an egregious [constitutional] violation if the stop was based on race (or some other grossly improper consideration)." *Oliva-Ramos v. AG of the United States*, 694 F.3d 259, 278 (3d Cir. 2012) (quoting *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235 (2d Cir. 2006)).

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 24

Second, the local St. Johnians who provided the tips were unnamed sources--simply referred to by McCoy as "locals," "local St. Johnians," or "residents." Tr. of Omnibus Hr'g, October 29, 2018. There was no record evidence to suggest that such tipsters could be held accountable if the allegations turned out to be fabricated. Third, there is no evidence that the tips contained any particular description of the individuals observed or any intimate or particularized information that was unavailable to the general public. Fourth, the Government provided no testimony regarding when the local St. Johnians observed the alleged criminal activity, nor whether any tips were received on August 27, 2018--the date on which Rivera Gomez and Recio-Fernandez were seized. Finally, the tips contained no predictive value corroborated by CBP.

Considering the totality of the circumstances present in this case, the tips from the local St. Johnians were completely devoid of sufficient indicia of reliability to support a reasonable suspicion that Rivera Gomez and Recio-Fernandez in particular had illegally entered the United States. Thus, their seizure was unreasonable and constitutionally impermissible. *See Terry*, 392 U.S. 1; *Brown*, 448 F.3d 239.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 25

Where a seizure suffers for want of reasonable suspicion it is ordinarily unconstitutional. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Even so, invalidation of that seizure may not always be a foregone conclusion.

Indeed, while the Supreme Court has recognized that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing," *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000), the Supreme Court, albeit with an air of cautionary disinclination, has "recognized only limited circumstances in which the usual rule does not apply." *Id.*; *United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir. 2006) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). There are two limited exceptions, special-needs and administrative search cases. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011).

The circumstances here do not implicate administrative investigations. Rather, they arguably implicate illegal border migration. As such, the United States asserts that the seizure was permissible because a border was involved. Indeed, the United States relies on a seminal illegal border migration case,

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 26

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), to

support its assertion.[4]

---

[4] The United States also asserts that the encounter that Rivera Gomez and Recio-Fernandez had with CBP was "consensual . . . involving no coercion or detention," *see* Government's Mot. to Den. Defs.' Mot. to Suppress at 3, and was not a seizure.

The United States relies on *INS v. Delgado*, 466 U.S. 210 (1984), to support its position. That reliance is misplaced. To begin, in *Delgado* the Immigration and Naturalization Service ("INS") agents obtained search warrants that were founded on probable cause. *Delgado*, 466 U.S. at 212. The search warrants, while not naming any particular individuals sought, permitted the INS officers to enter the factory to search for persons who were illegal aliens. *Int'l Ladies' Garment Workers' Union, AFL-CIO v. Sureck*, 681 F.2d 624, 627 n.5 (9th Cir. 1982), *rev'd sub nom. I.N.S. v. Delgado*, 466 U.S. 210 (1984). INS agents positioned themselves near the exits while other agents dispersed throughout the factory to question employees. *Delgado*, 466 U.S. at 212. The workers were not prevented by the agents from moving about the factory. *Id.* at 218. There was no evidence in the record indicating that the INS intended to prevent people from leaving. *Id*.

The Supreme Court held that the work force as a whole was not seized within the meaning of the Fourth Amendment by the conduct of the INS agents. *Id.* at 219; *compare Florida v. Royer* 460 U.S. 491, 501 (1983) (explaining that "asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves" under the Fourth Amendment) *with Brown v. Texas*, 443 U.S. 47, 52 (1979) (holding that absent some reasonable suspicion of misconduct, the detention of the defendant to determine his identity violated the defendant's Fourth Amendment right to be free from an unreasonable seizure). Because the Court found that none of the Respondents were seized, it did not address the issue of individual questioning. The Court did observe that where a "person refuses to answer and the police take additional steps -- such as those taken in *Brown* -- to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *Delgado*, 466 U.S. at 216-217.

Unlike the law enforcement agents in *Delgado*, the CBP agents who were involved in Operation Get A Grip elected to forego any kind of warrant that would necessitate judicial scrutiny before launching their operation. There was no particularized information regarding the ferry targeted by CBP on August 27, 2018. Additionally, CBP agents required the departing passengers to answer the agents' questions. If passengers could not present identification or satisfy the questioning of the CBP officers, those passengers were further detained. It is difficult to reconcile the United States's assertion that such an encounter was consensual and involved no coercion or detention with the objective facts, which suggest the contrary, as evident in McCoy's testimony. *See* Tr. of Omnibus Hr'g 62:16-63:12, October 29, 2018. Indeed, the Court is persuaded that the United States's argument is incapable of reconciliation with McCoy's testimony precisely because the government's admitted position was that freedom to leave was conditioned on satisfying a law enforcement officer's questions.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 27

To appreciate the reach of *Martinez-Fuerte*, a brief review of that case and several illegal border migration cases is warranted.

In a sequence of cases, the Supreme Court addressed the constitutionality of searches and seizures related to border migration. "In delineating the constitutional safeguards applicable in particular contexts, the [Supreme] Court has weighed the public interest against the Fourth Amendment interest of the individual." *Id.* at 555.

In *United States v. Brignoni-Ponce*, 422 U.S. 873, 878–80 (1975), the Supreme Court held that roving patrols may briefly seize the occupants of a vehicle if the officers have reasonable suspicion that the occupants are illegal immigrants. Analyzing the government's interest, the Supreme Court explained:

> The Government makes a convincing demonstration that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border. Estimates of the number of illegal immigrants in the United States vary widely. A conservative estimate in 1972 produced a figure of about one million, but the INS now suggests there may be as many as 10 or 12 million aliens illegally in the country. Whatever the number, these aliens create significant economic and social problems, competing with citizens and legal resident aliens for jobs, and generating extra demand for social services. The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 28

The Government has estimated that 85% of the aliens
illegally in the country are from Mexico. The Mexican
border is almost 2,000 miles long, and even a vastly
reinforced Border Patrol would find it impossible to
prevent illegal border crossings. Many aliens cross the
Mexican border on foot, miles away from patrolled areas,
and then purchase transportation from the border area to
inland cities, where they find jobs and elude the
immigration authorities. Others gain entry on valid
temporary border-crossing permits, but then violate the
conditions of their entry. Most of these aliens leave
the border area in private vehicles, often assisted by
professional 'alien smugglers.' The Border Patrol's
traffic-checking operations are designed to prevent this
inland movement. They succeed in apprehending some
illegal entrants and smugglers, and they deter the
movement of others by threatening apprehension and
increasing the cost of illegal transportation.

*Id*. at 878-879 (internal citations omitted).

The Supreme Court observed that "[r]oads near the border

carry not only aliens seeking to enter the country illegally,

but a large volume of legitimate traffic as well." *Id*. at 882.

Relevant regulations limited the Border Patrol's authority to

conduct roving patrols to within 100 miles of the border. If

allowed to conduct roving patrols with no individualized

suspicion, "Border Patrol officers could stop motorists at

random for questioning, day or night, anywhere within 100 air

miles of the 2,000-mile border, on a city street, a busy

highway, or a desert road, without any reason to suspect that

they have violated any law." *Id*. at 883. The Supreme Court was

"not convinced that the legitimate needs of law enforcement

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 29

require this degree of interference with lawful traffic." *Id.*
Accordingly, while the intrusion involved was "modest," the
Supreme Court held such seizures must be justified by reasonable
suspicion. *Id.*

In *Martinez-Fuerte*, 428 U.S. 543 (1976), the Supreme Court
addressed the constitutionality of permanent suspicionless
immigration checkpoints located within the United States. In
that case, the checkpoints were positioned on major highways at
points from 65 to 90 miles from the Mexican border. *Id.* at 549-
50. The checkpoints were all clearly labeled and attended by
officers in uniform. Addressing the government's interest, the
Supreme Court explained:

> Our previous cases have recognized that maintenance of
> a traffic-checking program in the interior is necessary
> because the flow of illegal aliens cannot be controlled
> effectively at the border. We note here only the
> substantiality of the public interest in the practice of
> routine stops for inquiry at permanent checkpoints, a
> practice which the Government identifies as the most
> important of the traffic-checking operations. These
> checkpoints are located on important highways; in their
> absence such highways would offer illegal aliens a quick
> and safe route into the interior. Routine checkpoint
> inquiries apprehend many smugglers and illegal aliens
> who succumb to the lure of such highways. And the
> prospect of such inquiries forces others onto less
> efficient roads that are less heavily traveled, slowing
> their movement and making them more vulnerable to
> detection by roving patrols.
>
> A requirement that stops on major routes inland always
> be based on reasonable suspicion would be impractical

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 30

because the flow of traffic tends to be too heavy to
allow the particularized study of a given car that would
enable it to be identified as a possible carrier of
illegal aliens. In particular, such a requirement would
largely eliminate any deterrent to the conduct of well-
disguised smuggling operations, even though smugglers
are known to use these highways regularly.

*Id.* at 556–57 (internal citations omitted).

Addressing the individual's interest, the Supreme Court

observed that, while undoubtedly a seizure, the checkpoints only

"involve[d] a brief detention of travelers" who were only asked

"a brief question or two" and sometimes asked to "produc[e] a

document evidencing a right to be in the United States." *Id.* at

558 (internal quotation marks omitted). The concerns present in

*Brignoni-Ponce* were not applicable in the context of the

permanent checkpoints:

First, the potential interference with legitimate
traffic is minimal. Motorists using these highways are
not taken by surprise as they know, or may obtain
knowledge of, the location of the checkpoints and will
not be stopped elsewhere. Second, checkpoint operations
both appear to and actually involve less discretionary
enforcement activity. The regularized manner in which
established checkpoints are operated is visible
evidence, reassuring to law-abiding motorists, that the
stops are duly authorized and believed to serve the
public interest. The location of a fixed checkpoint is
not chosen by officers in the field, but by officials
responsible for making overall decisions as to the most
effective allocation of limited enforcement resources.
We may assume that such officials will be unlikely to
locate a checkpoint where it bears arbitrarily or
oppressively on motorists as a class. And since field
officers may stop only those cars passing the

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 31

checkpoint, there is less room for abusive or harassing
stops of individuals than there was in the case of
roving-patrol stops. Moreover, a claim that a particular
exercise of discretion in locating or operating a
checkpoint is unreasonable is subject to post-stop
judicial review.

*Martinez-Fuerte*, 428 U.S. at 559.

The *sine qua non* for a suspicionless seizure of a traveler
is evidence that the route taken by the traveler is one that is
regularly used for illicit movement of illegal aliens. *Martinez-
Fuerte*, 428 U.S. at 562 n.15. The same concerns that belie the
validity of the tip in this case are manifest in, and bedevil,
any claim that the commercially operated and regularly scheduled
St. John ferry to St. Thomas is a well-known route for illegal
aliens.

Here, the Government presents only the uncorroborated
claims of the local St. Johnians that the ferry between St.
Thomas and St. John was being used by illegal immigrants.
Significantly, the Government failed to adduce any evidence that
the ferry has been used for such a purpose. Moreover, there is
no evidence regarding the frequency or veracity of such tips. As
such, there is scant evidence to determine the regularity with
which the St. John to St. Thomas ferry might be used for the
illicit movement of illegal aliens, let alone the reliability of

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 32

that information. As McCoy testified on multiple occasions, CBP

had no particular information regarding any specific ferry.

> THE COURT: How is it that you were aware that the
> particular ferry that you searched was one that was, that
> would have migrants on it?

> THE WITNESS: We weren't.

Tr. of Omnibus Hr'g 16:22-25, October 29, 2018. Additionally,

the Government presented no evidence that any illegal immigrants

have previously been apprehended disembarking the ferry. This

evidence is insufficient to support the contention that

significant numbers of illegal aliens regularly use the ferry

between St. Thomas and St. John.

Here, no heavy flow of traffic makes it impractical for law

enforcement to develop reasonable suspicion through observation

of, or questioning without seizing, individuals. In this case,

the CBP seized approximately 30 to 40 passengers disembarking

the St. John to St. Thomas ferry. The Government provides no

evidence why the CBP officers would not have ample opportunity

to develop reasonable suspicion for a *Terry* stop of any specific

individual.[5]

---

[5] Additionally, there is no evidence that the ferry between St. Thomas and St. John functions as an "important highway" offering "a quick and safe route to the interior." *Martinez-Fuerte*, 428 U.S. at 557.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 33

Finally, the government's reliance on border law jurisprudence overlooks a threshold requirement--the crossing of a border. That threshold requirement is not satisfied here. Indeed, this Court previously has held that there is no border between St. Thomas and St. Croix. *United States v. Rivera*, No. 2014-31, 2014 U.S. Dist. LEXIS 151950, at *2-5 n.4 (D.V.I. Oct. 23, 2014) ("Although Congress has erected a border between the Virgin Islands and the 'rest of the United States,' it has not erected one between St. Croix and St. Thomas.") (citations omitted). That holding has equal application between St. Thomas and St. John. In sum, there is no border between the several islands that comprise the United States Virgin Islands. Additionally, the United States appears to have previously acknowledged as much in *Silveus*. *Silveus*, 542 F.3d at 999 n.3 (noting that "the government distanced itself from [an alternate] holding [that the search was a proper border search], presumably because the ferry was traveling between two United States ports."). Thus, the seizure without particularized suspicion, of travelers between two United States ports--St. John and St. Thomas--finds no safe harbor in the special needs exception found in border law jurisprudence.

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 34

## IV.  CONCLUSION

The government launched Operation Get A Grip largely on the strength of CBP observation of individuals suspiciously disembarking from boats on St. John beaches, coupled with claims of anonymous local St. Johnians that illegal migrants were on the ferry traveling between St. John and St. Thomas. The claims about the legal status of individual travelers on the ferry that CBP attributes to local St. Johnians are generalized, vague, and conclusory. They fail to address any number of questions, including: who is the tipster; which traveler is an illegal migrant; how does the local St. Johnian know any given individual is an illegal migrant; how is an unknown individual's disembarkation from a boat on a beach at an undefined time connected to a particular person on the targeted ferry; and, when did the tipster acquire the information.

To be sure, the government has offered some general information of suspicious activity. However, the government has failed to offer any particularized evidence that any person who suspiciously disembarked on a beach is connected to any person on the targeted ferry. Indeed, without more, random individuals on a ferry could be targeted based on appearance. While the arrest of illegal entrants may invite *post hoc* rationalization,

*United States v. Gomez*
Criminal No. 2018-31
*United States v. Recio-Fernandez*
Criminal No. 2018-32
Order
Page 35

that invitation must be declined to the extent the seizure is predicated on subjective feelings as, absent an articulable basis, "one citizen's subjective feelings are not enough to justify the seizure of another." *Johnson*, 332 F.3d at 210.

The Court is not unmindful that at the core of this matter, law enforcement officers engaged in an effort to arrest illegal activity. However laudable the impetus for such efforts, they cannot proceed in a manner that is untethered to the Constitution. While the end--the arrest of individuals who may be illegally in the country--may seem valuable, it does not justify the means--the suspicionless seizure of individuals in violation of the Fourth Amendment. If it did, the thing that should be valued--the Constitution--would be diminished.

The premises considered, it is hereby

**ORDERED** that Rivera Gomez's and Recio-Fernandez's motions to suppress are **GRANTED**; and it is further

**ORDERED** that the physical evidence and statements recovered as a result of the suspicionless seizures on August 27, 2018, are **SUPPRESSED**.

S\_____
       **Curtis V. Gómez**
       **District Judge**